Myers *v.* Gemmel.

NEW-YORK GENERAL TERM, February, 1851. *Edmonds, Edwards, and Mitchell,* Justices.

MYERS *vs.* GEMMEL.

The common law of England, on the subject of light and air, as an easement or incident to real estate, is not the law of this country. It was inapplicable to the condition of this country when this state was settled by the colonists; it was not brought hither by them, and formed no part of the law of the colony on the 19th of April, 1775. Where, therefore, an owner of two adjoining lots in the city of New-York, upon one of which was a building deriving its light and air over and through an open space in the rear of the other lot, into which the windows of the building opened and looked, leased the building and lot upon which it was erected for a term of years, with its appurtenances, without reserving to himself a right to build on such other lot, or stop, or darken the windows of the building leased, and afterwards built a house, covering the whole open space of the other lot, darkening the windows, and excluding the light and air from the building occupied by his tenants: *Held,* that the landlord might lawfully darken or stop the windows by any erection on the other lot, and that such an act was not in derogation of his own grant, and he could not be restrained by injunction from so doing.

APPEAL from an order made at special term, denying a motion to dissolve an injunction. This was an action under the code, commenced in September, 1850, for an injunction, and in

the nature of an action on the case, for a nuisance to the light and air, to which the plaintiff claimed a right of enjoyment, as an incident and easement to the building occupied by him and leased from the defendant, on the north-east corner of Reade-street and Broadway, in the city of New-York. The complaint stated that the plaintiff, relying upon the continuance of the light and air in the manner it had been accustomed to flow and pass over the rear of the lot adjoining and owned by his land-lord the defendant, had expended several thousand dollars in improving and repairing the building, and had under-let the same in tenements, so that it yielded him a large profit. That the defendant also owned the lot adjoining in the rear on Reade-street, and was erecting a wall upon his own lot in the rear of this building, demised to the plaintiff, which would exclude a large portion of the customary light and air thereof, and render the premises dark and almost useless, and uncomfortable and unwholesome. An injunction was asked for, to prevent the con-tinuance of this erection, and damages for the injury done. An injunction was granted *ex parte.* An answer was afterwards put in, but the statement of the case was not materially varied. The other facts sufficiently appear in the opinion of the court. A motion was made by the defendant to dissolve the injunction, and was argued before Edmonds, P. J. who decided that a land-lord who owns premises adjoining those he has let to his tenant, has no right to make erections thereon, whereby the enjoyment of the demised premises may be disturbed, as by erecting a high wall on the adjoining lot to deprive his tenant of light or air ; and his doing so, if it operate so far to disturb the enjoyment as to dis-solve the tenancy, may be restrained by injunction. He there-fore denied the motion to dissolve the injunction; and the de-fendant appealed.

*Charles O'Conor*, for the defendant.

*Edward Sandford,* for the plaintiff.

MITCHELL, J. On and before 1st Feb. 1849, Mr. Gemmel was seised in fee of the corner house and lot on the east side of

Myers *v.* Gemmel.

Broadway, and north side of Reade-street in this city, known as No. 290 Broadway, and also of the houses and lots adjoining to these, known as No. 40 Reade-street. The Broadway lot was 34 feet wide on the front on Broadway, and of the same width in the rear, and 63 feet deep on Reade-street, and on the opposite or north side. The house on that lot was five stories high, and was fifty-eight feet in height, and covered the whole lot except an area of 13 by 23 feet; this area or open space beginning on one side at the distance of fifty feet from Broadway, and extending to the Reade-street lot, and on the other side beginning 11 feet from Reade-street, and extending to the north side of the lot. The Reade-street property consisted of two lots 44 feet front, and 34 feet deep, on which were erected two three story houses, each 22 feet deep from Reade-street and 28 feet high at the eaves of the roof, and 35 feet at the peak. Thus the Reade-street lots being 12 feet deeper than the houses on them, had yards 12 feet in depth. One De Forrest then owned or occupied the lot to the north of these, but had not built to the rear of his lot, so that Mr. Gemmel's three houses had light from De Forrest's yard, and from Gemmel's area and yards. The Broadway house had and still has the advantage of light from Broadway, (one of the broadest streets in that part of the city,) and along its whole depth on Reade-street; and as if to secure light to the rear, windows were placed in each story on that part which faced the area. There were not, however, windows in the part of the rear wall which adjoined the Reade-street lot, although that wall rose from 23 to 30 feet above the Reade-street houses. There was also a wooden fence eight feet high, entirely separating the Broadway lot from the Reade-street lots: and on the area there were privies erected commencing 2 or 3 feet south of De Forrest's lot, and extending about 7 feet along or near the boundary between the Broadway lot and the Read-street lots and rising to the height of 20 feet and communicating with the Broadway house, partly by means of a piazza 3 feet wide over part of the area. There was no communication between the Broadway lots and the Reade-street lots. On the 19th February, 1849, Gemmel leased to Durell for 7

years from 1st May, 1849, "the house and lot known as No. 290 Broadway; in the city of New-York, with the appurtenances," at the yearly rent of $3500 payable quarterly. The lease was under seal, and the landlord entered into no covenants except to keep the roof in repair. In September, 1849, the lease was assigned by Durell to Myers the present plaintiff. Since that, De Forrest has built on the whole rear of his lot, so as to cut off the light that came over his open yard through a space 13 feet wide. In June last, Gemmel tore down his houses on Reade-street, and began the erection of other houses which are intended to cover the whole of the Reade-street lots, and to be five stories high, and to rise ten feet above the Broadway house. This action was commenced to prevent his erecting such buildings, and an injunction order was granted to that effect. A motion was made at special term, on the coming in of the answer, to dissolve the injunction; that motion was denied, and the defendant has appealed from the order then made.

The counsel for the defendant, with that fairness and boldness for which he is distinguished, admitted that he could not sustain the appeal if the decisions made in England for the last fifty years, as to the right to light, are to control this case, and the counsel for the plaintiff admitted, with equal fairness, that he did not rely on any covenant, express or implied, on the part of the landlord, and accordingly that the landlord was not liable for any injury resulting from the erection of De Forrest. There was no express covenant applicable to the case, and since the revised statutes have declared that no covenant shall be implied in any conveyance of real estate, and that the term "real estate" is co-extensive in meaning with, "lands, tenements and hereditaments," (1 *R. S.* 738, § 140; *p.* 750, § 10;) it is at least probable that no covenant could be implied. The ground assumed by the plaintiff is, that a part of the thing actually demised, was the right in the Broadway lot to derive light and air from the Reade-street lot; in other words, that by the act of the common owner of the lots, this right had been made part of the Broadway house and lot, and so would pass in any lease or conveyance of that lot.

Only such parts of the common law as, with the act of the colony in force on the 19th April, 1775, formed part of the law of the colony on that day, was adopted by us—and only such parts of the common law were brought by the colonists with them as suited their condition, In the application of this restricted rule, a mortgage has been considered with us as being only a security for money, and as leaving the legal title in the mortgagor, as to all persons except the mortgagee, while in England the mortgage was considered as passing the whole legal title to the mortgagee. In England it was " waste" for a tenant to cut down timber ; with us, on the contrary, good husbandry required that on a lease of lands, mostly unimproved, the tenant should be permitted to cut down large portions of the timber. So while the population was scattered, and houses were not crowded together, there could not for many years be an occasion for applying the law of ancient lights as now understood in England. It appears by the act of 19 Car. 2, ch. 3, passed immediately after the great fire in London of 1666, that there were streets or lanes in that great city not more than fourteen feet in width. (*See Keeble's Laws.*) In such streets the houses must have derived their only valuable light from their sides or rear, and the necessity of the case may have justified a presumption as a matter of fact from a long undisturbed enjoyment, that the lights for the sides or rears of the houses had been granted to those houses by the owners of the adjoining lots. The custom that may have thus arisen, when once established, would be applied also to the houses on the wider streets. Where houses were thus crowded, and so little space left even in the public streets for air and light, it could hardly be supposed that one would leave his land unoccupied and permit his neighbor to receive the benefit of this circumstance, if he were not bound to do so. There was, therefore, no violence to the usages of such places to presume a grant of the right to the ancient lights in such cases. The usage, too, was not uniform; for in London, by custom, a man could build to any height on his ancient foundations. (*Vin. Abr. Stopping Lights, C.* 1.)

With us there was no room for any such presumption. In

Myers *v.* Gemmel.

the early settlement of the colonies land must have been too abundant for any such question to arise. Light and air came, as the blessings of heaven, in abundance for all; so that no one could think of claiming a restriction upon his neighbor's lands in order to enjoy them. The abundance and cheapness of land would lead each owner of a house to leave open spaces about his own house, that he might enjoy them as his own, and which he would regulate to suit himself; a garden or an alley might be at the side of his house, and he might, from his side windows, overlook his neighbor, and his neighbor overlook him, and each receive light and air from across the lands of the other; but neither could, in such a condition of the country, claim this as a right. Thus the greater part of two centuries may have passed without any emergency arising, in which the law, as to the right to lights, could arise.

A law inapplicable to the condition of the country for so long a period, could not belong to that part of the common law which we brought with us, namely, " so much only as was applicable to our condition," nor as " part of the law of the colony on 19th April, 1775." And if it could be considered as lying dormant, it could be revived only in such forms and under such circumstances as the habits of the community, and a just regard to the previous general practice and understanding would require. The streets in our cities have been generally broad enough to afford an abundance of light, so far as the front of the house is concerned; the lots were generally, too, laid out of such depth as to secure ample light from the rear. And when additional lights have been left on the sides, they have not been considered as giving rights over the adjoining owner's land, but each owner, as his own interest has dictated, has occupied the whole of his own ground. It is against the spirit of our people to incumber their lands with privileges in favor of other, though adjoining lands, whether held by them or others; what they own they wish to own absolutely, without being subject to any rights in any other, and to be at liberty to sell or retain each part free from control from the other. They are proverbially distinguished for looking to the future, and as they

expect future greatness to their country from the course of years, so they are confident that the future will add to the value of their lands, and create the expediency and necessity of improving them by more extensive buildings. Yet, while they were not injured by their neighbor's deriving any benefit from their unoccupied lands, it would be equally against their sense of right to interfere with their neighbor's enjoyment. With this feeling pervading the people, it is not surprising that (as we believe the fact to be,) lawyers in extensive practice in real estate, have not known any instances of express grants of rights to light and air until within a very few years, and then in but few cases. In such a community it would be doing violence to the habits and customs of the people to presume a grant or intention to grant a right to another over adjoining property not within the limits shown on the face of the grant, or not unquestionably indicated by the use and situation of the property ; and if it were left to a jury they could not properly find that there was such a grant.

If (as in Jones' Court, and in Jauncey Court in Wall-street, in this city,) buildings are erected occupying the four sides of the lot, with an open space in the middle for light and air, which is free to the occupants of all the rooms in the adjoining buildings, with a common entrance for all, and separate apartments are then let out to different tenants, the owner may well be considered to have dedicated that open space for the benefit of all the tenants ; the intention to do so would be undoubted—it would be only necessary to show the place or a plan of it, to obtain the admission of all, that such was the intention. So, also, by the devise of a mill ; the right to use the water that moves it may well pass as part of that which was meant by the words used : and if a stream runs through land sold, and also through adjoining land, the right to have it continue to flow, and that it should not be diverted, would pass as part of what was clearly intended to be granted. On this principle, the case of *Story* v. *Odin*, (12 *Mass.* 157,) may well have been approved wherever it was referred to ; although in some instances, it has been quoted to sustain the present English doctrine. There the

plaintiff's house was bought by him in 1795, from the town of Boston; it then with other three buildings, formed part of three sides of a square, and had (as well as the other houses) a door in *each story* opening into a vacant lot of ground in the middle of this square; this vacant lot was used by the several tenants as a deposit for casks, boxes, etc. and sometimes for a passage way. The yard continued to be so used until 1812, when it was sold by the town to the defendant. The vacant lot was thus actually connected with the adjoining buildings, by means of the door in each story opening into it, and also by the use to which it was devoted, and this would be the conclusion on a mere view of the lot—the view alone would be enough also to indicate that both were owned by the same parties. If that use of the yard had been confined to the building of the plaintiff only, there would have been little doubt that the vacant lot formed part of the house and lot bought by the plaintiff; as a yard used with any other house may form part of the lot on which the house is built. But the facts here are entirely different. No one would imagine in this case, by only seeing the property, that any rights were attached to the Broadway house over the Reade-street lot, any more than that they extended over De Forrest's lot also. It would be seen that while De Forrest's lot was left open the light would be probably sufficient; but no inference would be drawn that the landlord meant to grant a right over De Forrest's lot as a part of the thing demised, nor would the inference be any more justifiable that he meant to grant a right over the Reade street lots. If the lessee knew that Gemmel owned the Reade-street lots (which is not alledged here,) and he expected to derive light during his term from the Reade-street lots, it would have been only fair for him to have said so to his landlord, and to have expressly agreed with him for that privilege.

The form of the Broadway building also showed to the tenant that the landlord had constructed it so as to secure to it a *definite* quantity of light and air within its proper bounds, and that it was not to depend on deriving either from other sources. The extreme rear adjoining the Reade-street property, though between 23 and 30 feet above the Reade-street houses,

and 12 feet in depth, had not a single window in it. Thus indicating that the expectation was that the Reade-street property would be raised so high as to cover any lights that might be put there. In the same way lights were placed in every story on the south and west sides of the area, that they might get the light from it. If it had been intended to subject the Reade-street lots to this incumbrance, Gemmel would undoubtedly have left no open area opposite the yard of the Reade-street lots, but would have built his Broadway house close up to that yard. So, too, not only was there a fence to separate one lot from the other, but there were privies on the Broadway lot rising to the height of 20 feet, and covering all but 5 feet of the space opposite the yard of the Reade-street lot; this 20 feet of height precluded the idea that light was intended to be derived to the Broadway lot from the lot on Reade-street; it would almost as effectually darken the cellars and first story and part of the second story as the present unfinished building.

The counsel for the plaintiff did not state whether in his view Mr. Gemmel would have retained this privilege as belonging to his Broadway lot if he had retained that lot and sold the Reade-street lots to another person; yet if from the construction of the building that privilege had become part of the Broadway lot so as to pass by a simple grant or lease of that lot, that result would seem to follow; and it is probable that such is the English law in such cases; and that the right does not depend on which is first sold by the common owner of the two lots. Such is the opinion of Gale and Whatley in their valuable "Treatise on Easements." They say: "the obligation is imposed equally on the grantee and the grantor," (p. 50.) They add, (p. 51,) that "the only opposition to the *current* of authority that this disposition is binding equally on the grantor and *grantee* and the parties claiming under them respectively, is a dictum of Lord Holt in the case of *Tenant* v. *Goodwin,* as reported by L. Raymond," and the cases quoted, and the principles stated by them seem to sustain their view (*see Ib. p.* 51 *to* 77.) Such was the opinion of Twisden, J. in *Palmer* v. *Fletcher,* (1 *Lev.* 122,) and the decision in *Riviere* v. *Bower,* (1 *Ryan & Moody,* 24,)

where the landlord recovered against his tenant for obstructing lights of a house adjoining the demised premises; such also is the rule in the analogous cases of ways of necessity, where if the grantor sells lands surrounding a close which he retains, he retains a right of way over the lands sold, (*see Gale and W. as above, and p.* 77, *&c.*) The same rule has also been applied to light where the sales of both lots were at the *same time,* as in *Swansborough* v. *Coventry,* (9 *Bing.* 305.)

A rule thus blindly fettering estates without any written evidence of right, and equally annoying to buyer and seller, should not be adopted here unless it is clearly the law of our own state. Justice Bronson showed in the case of *Parker* v. *Foote* in 19 *Wend.* 309, that the English law as to lights does not apply to this country; and we would have simply referred to that decision, but that it was truly said that that case *was also* decided on another point; still the chief justice expressly concurred with him on that point, and it is believed that that part of the opinion was received at the time with cordial approbation by the public and the bar. Vice Chr. Sandford, in *Banks* v. *American Tract Society,* (4 *Sandford's Ch. R.* 465,) admits that such "is probably to be deemed the decision of the court," but declined expressing an opinion whether it was an open question or not, and said still less did he mean to intimate a bias either way. He has since published the 2d vol. of the Superior Court Reports, of which court he is a distinguished member, and without expressing any dissent, gives the decision of that court in the case of *Palmer* v. *Wetmore,* and states the point decided to be that a landlord who owns land adjoining the demised premises has a right to build on such land, though he may thereby obstruct and darken the windows in the tenement demised (*p.* 316.) Authority as well as principle show that to be the law of this state.

The order appealed from should be reversed with costs, and the injunction be dissolved.

EDWARDS J. concurred.

EDMONDS, P. J. dissented.                    Order reversed.