[No. 1112.]

IN THE MATTER OF THE ESTATE OF WILLIAM H.
CLARK, DECEASED. NELLIE CLARK, APPELLANT,
v. P. CLARK, ET AL., RESPONDENTS.

COMMON LAW—WHEN LAW OF THIS STATE.—The common law of England,
as modified by English statutes, adopted prior to the time of the declara-
tion of American independence, is presumed to be the law of this state, so
far as it is applicable to our condition.

ESTATES OF DECEASED PERSONS—DISTRIBUTION—HOW MADE.—W. H. Clark died
intestate without issue, leaving a widow and brothers and sisters, but no
father or mother. Upon the sale of real property belonging to the estate,
the court distributed the proceeds as follows: One-half to the widow and
one-half to the brothers and sisters: Held, correct under the rules of the
common law.

APPEAL from the District Court of the Sixth Judicial Dis-
trict, Eureka County.

The facts appear in the opinion.

*Wren & Cheney*, for Appellant:

I. Under the statute (1 Comp. L. 151) the widow is entitled
to one-half of the community property in her own right,
absolutely independent of any attempted testamentary dispo-
sitions thereof by the husband, subject only to the payment
of debts. (*Beard* v. *Knox*, 5 Cal. 252; *Payne* v. *Payne*,
18 Cal. 291; *Morrison* v. *Bowman*, 29 Cal. 337; *Estate of
Silvey*, 42 Cal. 210.) As to separate estate. (1 Comp. L.
794.)

II. The distinctions between the descent of the real estate
and the distribution of the personal property of an intestate,
which existed at common law, have been abolished, and in
this state both real and personal property descend, and are
distributed in the same manner. (*Estate of Millenovich*, 5
Nev. 161, 185; *Cofer* v. *Flanagan*, 1 Ga. 538, 540; *Thomp-
son* v. *Duncan*, 1 Tex. 485, 490; 2 Kent Com. 568, 571.)
This is in harmony with the statute, which gives the adminis-
trator of an intestate the right of possession of all the real
and personal estate of the deceased, as well as the rents and
profits, during the administration of the estate. (1 Comp. L.
596; *Gossage* v. *Crown Point M. Co.*, 14 Nev. 153.)

III. Although the statute may fail to provide in express terms for every possible condition, we contend, on behalf of the appellant, that it was the manifest intent of the legislation of this state to make the wife a distributee of the separate estate of her deceased husband. That the statutes relating to descent and distribution manifest this intention by providing that she shall be a claimant to a portion of the estate as against the children and father of her husband, and by providing that, in certain cases, she shall take the whole of the estate. An examination of the statute will show that in all the enumerated cases, as long as the wife lives, she is entitled to participate in the distribution. If she is entitled to a portion of the estate as against those nearest to the deceased, his children, *a fortiori* should she be against those more remote, his brothers and sisters. In the interpretation of a statute, the first thing to be ascertained is the ultimate and general purpose of the enactment of the law. (*Roney* v. *Buckland*, 4 Nev. 45; *Maynard* v. *Johnson*, 2 Nev. 25; *Brown* v. *Davis*, 1 Nev. 409; *Odd Fellows' Bank* v. *Quillen*, 11 Nev. 109; *V. & T. R. R. Co.* v. *Lyon Co.*, 6 Nev. 68; *Heydenfeldt* v. *Daney G. & S. M. Co.*, 10 Nev. 313; *State* v. *Dayton Toll Road*, 10 Nev. 156.)

IV. The right of the wife to share in the distribution of her husband's separate estate is not changed by the act defining and creating community property. Prior to March 7, 1865, there was no community property in the state or territory of Nevada. The act of that date defining the rights of husband and wife was the first legislation upon that subject. (Stat. 1864, 239.) The act providing for the distribution and descent of the estates of intestates was passed November 29, 1861, at which time there was no community property in this State. The legislature could only have intended it to apply to the separate property of the intestate. It is so declared in express terms. (1 Comp. L. 803.)

V. The act of November 29, 1861, is not repealed by implication by the act of March 7, 1865, or March 10, 1873. The act of 1861 treats of a different subject matter than the acts of 1865 and 1873. Prior to March 7, 1865, the wife had an estate by dower in the property of her husband. By the act

of that date that estate was abolished, and the act of 1873 contains the same provision. (1 Comp. L. 157.) One-half of the community property was given to the wife in lieu of her dower thus taken away. (*Beard* v. *Knox*, 5 Cal. 252.) The wife is entitled to share in the distribution of her husband's portion of the community property. (*Jewell* v. *Jewell*, 28 Cal. 232.) Repeals by implication are not favored. If the two acts can stand by any fair construction they must both be upheld. (*Estate of David Walley*, 11 Nev. 260; *Thorpe* v. *Schooling*, 7 Nev. 17; Sedg. on Const. 97, 98.) The whole intent and purpose, not only of the legislation of this state, but of this country, is to enlarge and secure the property rights of a *femme couverte*. The manifest purpose of the legislature should not be defeated by strict legislation. (Sedg. on Const. 271.)

VI. The descent and distribution of real estate of an intestate according to the common law of England. In computing degrees of consanguinity the rules of the common law are followed. (2 Black Com. 494, 496.) The freehold descended immediately to the heir at law; the administrator had nothing to do with it. (2 Black Com. 494, 496; 2 Hilliard on Real Prop. 189; *Beckett* v. *Selover*, 7 Cal. 238; 3 Cr. Dig. 221.) In the distribution of personal property, if there are no children or their lineal descendants, a moiety shall go the widow and a moiety to the next of kindred in equal degree. (Stat. 22 and 23, Can. II. ch. 10; Stat. 29, Can. II. ch. 30; 2 Black Com. 515; 2 Kent Com. 559, 562.) In determining the distribution of personal property degrees of consanguinity are reckoned according to the rules of civil law, and the half-blood take equally with the whole blood. (2 Black Com. 504, 515; *Crooke* v. *Watt*, 2 Vern. 124; Showers cases, 108.)

VII. The common law of England, to be in force in this state, must be consistent with, and not repugnant to, the spirit of our laws and in conformity with the general policy of our government. (*Waters* v. *Moss*, 12 Cal. 535; *Bates* v. *Brown*, 5 Wall. 710; *Morgan* v. *King*, 30 Barb. 9.) The English common law of descent, in its most essential features, has been universally rejected in the United States. (4 Kent. Com. 426; Reeve on Des. 11.) It is inconsistent with, and

repugnant to, our laws. It prefers the male to the female; our statues do not. (1 Comp. L. 794.) By it property always descends; under our laws it ascends. It prefers the whole to half blood; here they are equal, except as to ancestral property. (Id., sec. 797.) It excludes younger males in favor of the eldest; with us there is no such difference. Degrees of relationship are, under the common law, determined by the canon law. We follow that rule of the civilians. (Id., sec. 797.) Under that system estates would eschew rather than descend to the wife. In Nevada the wife, if living, is distributee in all cases. The common law of descent had its origin in the feudal system. The reasons upon which the canons of inheritance were founded were derived from and are peculiar to that system. That system has never prevailed upon this continent. In its very essence it is antagonistical to our theory of titles to property, and the rules of descent drawn from that system are as "incompatible with that universal participation in civil privileges, which it is the constitutional policy of this country to preserve and inculcate," as the system itself. (4 Kent Com. 435; *Cessante ratione legis, cessat etipsa lex*; Co. Litt. 70 b.; 2 Black Com. 390, 391; Broom's Max. 68.) The English statutes of distribution, passed prior to the declaration of American independence, are consistent with, and not repugnant to, our laws, and if any rule of the common law is to be adopted, should be taken as the rule of decision in this case. (2 Kent Com. 568, 571, 559, 562; Stat. Can. II. ch. 10; *Bates* v. *Brown*, 5 Wall. 716, 717.) These statutes of distribution having been in force in England at the time the colonies withdrew from the mother country, are a part of the common law of this country. In their spirit and terms, they are in harmony with the letter and extent of our laws, and in their interpretation governed by the same rule. The harshness and injustice of the canons of inheritance, which are an ulcerous blotch upon the fair face of the common law, stand out in striking and disastrous comparison with the fair and equitable terms of the statutes of distribution, the wisdom of its provisions commending it to the legislatures of this country as a fitting basis for a more civilized and equitable distribution of the estates of deceased persons.

*Baker & Wines*, for Respondent :

(No brief on file.)

By the Court, BELKNAP, J. :

William H. Clark died intestate without issue, leaving a widow and brothers and sisters, but no father or mother, heirs surviving.

The administrator of the estate, under the orders of the court, sold some of the real property belonging to the estate, and, desiring to distribute a portion of the proceeds, petitioned the district court for an order of partial distribution.

Upon the hearing of the petition, and it being admitted that the property belonged to the community, the court directed that one-half of the property be distributed to the widow, in conformity with the requirements of the eleventh section of the statute entitled "An act defining the rights of husband and wife." (1 Comp. L., sec. 151.) This section reads as follows: "Upon the death of the husband one-half of the community property goes to the surviving wife, and the other half is subject to the testamentary disposition of the husband; and, in the absence of such disposition, goes to his descendants, equally, if such descendants are in the same degree of kindred to the decedent; otherwise, according to the right of representation, and, in the absence of both such dispositon and descendants, is subject to distribution in the same manner as the separate property of the husband * * *."

To extent stated the order made is conceded to be correct, but the court excluded the widow from further participation in the proceeds, and directed the remaining one-half of the property to be distributed among the brothers and sisters of the intestate.

The question presented by this appeal is whether the widow is entitled to any portion of this one-half.

It is conceded that this case does not fall within any of the provisions of our statutes concerning descents.

In the absence of statutory regulation the common law of England, as modified by English statutes, adopted prior to the time of the declaration of American independence, is presumed

to be the law of this state, so far as it is applicable to our condition.

Under this law the property (which, for the purposes of this case, should be treated the same as real property) would go to the brothers and sisters of the intestate.

The distribution was properly made under this law, unless it is inconsistent with the enactments of our legislature, or with our institutions, or is unsuited to our condition. This latter exception has frequently been enforced.

The provision of the common law of England, which forbade the tenant to remove agricultural fixtures, is a case in point. The supreme court of the United States, in *Van Ness* v. *Pacard*, 2 Pet. 137, intimated that this feature of the law was inapplicable to this country, and as reason for the position suggested that at the time of its settlement the country was a wilderness, and the universal policy was to procure its cultivation and improvement. "The owner of the soil," said the court, "as well as the public, had every motive to encourage the tenant to devote himself to agriculture, and to favor any erections which should aid the result; yet in the comparative poverty of the country what tenant could afford to erect fixtures of much expense or value, if he was to lose his whole interest therein by the very act of erection? His cabin or log hut, however necessary for any improvement of the soil, would cease to be his the moment it was finished." (p. 145.)

Upon the same principle it was decided in New York that the doctrine of ancient lights, as it existed in the mother country, was not brought by the colonists to this country. (*Myers* v. *Gemmel*, 10 Barb. 537.)

Among the reasons assigned for this conclusion was that the population of the new country was scattered and houses not crowded together, and that under these circumstances there was not the same reason or occasion for applying the English doctrine here as in the city of London, where buildings were crowded together and some of the streets not more than fourteen feet in width.

In these and in other cases to be met with, courts have, for reasons which must commend themselves, declared that the

common law, as it existed in England, was unsuited to our condition, and to this extent have not been bound by it.

Upon the same principle, so much of the English common law as is inconsistent with our institutions, or repugnant to the policy of our government, is not presumed to have been adopted.

It is said by chancellor Kent, in his Commentaries (4 vol., p. 274), that " in the United States the English common law of descents, in its most essential features, has been universally rejected, and each state has established a law of descent for itself."

Following the example of the older states, this state has rejected many of the essential features of the English law of descents. Disregarding the preference of males to females and rejecting the claims of primogeniture are illustrations of these changes.

But because of these and other changes it does not follow that the particular provision of the common law of descents, which we are called upon to apply in this case, is within any of the exceptions stated.

The establishment of canons of descent is a matter peculiarly within the province of the legislature. Most of the cases likely to arise have been expressly provided for by statute, and in cases not provided for we must assume that the legislature intended to allow the common law to stand unchanged. To hold otherwise would leave this latter class of cases subject to the doubtful result of inference or analogy to be drawn from our statutes. We cannot infer that the legislature intended something which it has not expressed, nor can we assume its functions and interpolate anything into its enactments.

In the state of New York the first statute upon the subject of descents was passed in the year 1782, and afterwards, in 1786, a second statute was passed. Neither made any reference to the common law, but each omitted cases for which the common law provided.

In the omitted cases chancellor Kent assumed the common law to be the law of New York. Upon this subject he says : " The common law rules of descent were the law of the colony

Points decided.

and state of New York, down to 1782. The law was then altered, and the statute altering it re-enacted in an improved state, in 1786. The law still required the heir to be heir to the person dying seized, and the inheritance descended: 1. To the lawful issue, standing in equal degree, in equal parts. 2. To his lawful issue and their descendants, in different degrees, according to the right of representation. 3. To the father. 4. To brothers and sisters. 5. To the children of brothers and sisters. The right of primogeniture and preference of males was, in their case, superseded. In all cases of descent beyond these five cases the common law was left to govern. The revised statutes, as we have seen, have carried the innovation much further, and the estate descends under the principle of equality of distribution. 6. To the descendants of brothers' and sisters' children to the remotest degree. 7. To the brothers and sisters of the father of the intestate and their descendants; and then to the brothers and sisters of the mother of the intestate and their descendants, or to the brothers and sisters of both father and mother of the intestate and their descendants, according to the various ways in which the estate may have been acquired. It is a matter of some surprise that the revised statutes of New York did not proceed and, in cases not provided for, follow the example of the law of descents in most of the states of the Union, and direct the inheritance to descend to the next collateral kindred, to be ascertained, as in the statute of distribution of the personal estates of intestates, by the rules of the civil law. Instead of that we have retained in New York, in these remote cases, the solitary example of the application of the stern doctrine and rules of the common law." (Kent Commentaries, 4 vol. 411.)

The order of the district court is affirmed.