(21 App. Div. 348.)

## HEALTH DEPARTMENT OF CITY OF NEW YORK v. DASSORI.

(Supreme Court, Appellate Division. First Department. October 15, 1897.)

1. HEALTH—BUILDINGS—FITNESS FOR HABITATION—SUFFICIENCY OF EVIDENCE.

A tenement building condemned as unfit for human habitation is 91 feet long and 20 feet wide and five stories high. In front of it, and running lengthwise with it, is a court varying from 5 to 7 feet in width, and entirely surrounded by buildings, the lowest of which is three stories high, except that there is a space of 11 inches between a side wall of the tenement building and another building. The side walls of the building in question are without openings, except a small window on one side of each story. The rear wall stands 8 inches from another dead wall, and the space between is filled with filth. The apartments in the building consist of three small rooms,—a front room having two windows, and two bedrooms in the rear, having a single window, opening upon the 8-inch court. The cellars are occupied by school sinks for the use of tenants in that and another building. They open into the court yard, and are not otherwise ventilated. They are damp, and their almost unendurable stench pervades the building. The stairways are foul, the rooms are wet from leakage of the roof, the places around the hall sinks also are always damp, and the building swarms with vermin. The lower floors are lighted artificially most of the time for want of sunlight. Over 100 people reside in the building. The death rate of tenants is almost double that of the city. It is also much higher than the ward death rate, and the infant death rate is abnormally high. These deaths were mostly caused by diseases nourished by dampness and foul air. *Held*, that the building is unfit for human habitation.

2. SAME—BUILDINGS SUSCEPTIBLE OF SANITARY CONDITIONS—EVIDENCE.

Consolidation Act, § 659, as amended by Laws 1895, c. 567, provides that whenever, in the opinion of the board of health, any building that has been ordered vacated by said board is, "by reason of age, defects in drainage, plumbing, infection with contagious disease, or ventilation, or because of the existence of a nuisance on the premises, which is likely to cause sickness among its occupants or among the occupants of other property in the city of New York, or because it stops ventilation in other buildings, or otherwise makes or conduces to make other buildings adjacent to the same unfit for human habitation, or dangerous or injurious to health, or because it prevents proper measures from being carried into effect for remedying any nuisance injurious to health or other sanitary evils in respect to such other buildings, so unfit for human habitation that the evils in or caused by said building cannot be remedied by repairs or in any other way except by the destruction of said building or a portion of the same, said board of health may condemn the same and order it removed, provided the owner or owners of said building can demand a survey of said building in the manner provided for in case of unsafe buildings, and may institute proceedings in the supreme court in the county of New York for the condemnation of said building"; that said proceeding shall be instituted and carried on in the manner prescribed by the Code of Civil Procedure, except as modified by this act; and that upon the institution of said proceedings the owner of said building, or any person interested therein, may, in his answer, dispute the necessity of the destruction of said building, or any part thereof. *Held*, in condemnation proceedings under the statute, that the fact that buildings are unfit for human habitation does not necessarily involve the conclusion that they cannot be made fit.

3. SAME—CONDEMNATION—WHEN PROPER—USE OF BUILDINGS.

Nor does the fact that they cannot be made fit for such habitation necessarily involve a necessity for their destruction, since a thing that is a nuisance merely because of the use to which it is put cannot be destroyed by way of abating the nuisance, if it may be abated by simply discontinuing such use.

4. SAME—EFFECT ON ADJACENT HABITATIONS.

The fact that buildings sought to be condemned are so located that their presence, even though not used for habitation, is such as to render adjacent

47 N.Y.S.—41

buildings unfit for that purpose, is not ground for their destruction, under the statute.

Appeal from special term.

Proceedings by the health department of the city of New York against Frederick Dassori and others. From a final order in favor of plaintiff, defendant Dassori appeals. Reversed.

Argued before PATTERSON, RUMSEY, WILLIAMS, O'BRIEN, and PARKER, JJ.

David Keane, for appellant.
Roger Foster, for respondent.

RUMSEY, J. This proceeding was begun under the authority of section 659 of the consolidation act, as amended by chapter 567 of the Laws of 1895, for the purpose of condemning certain buildings situated in the rear of Nos. 308, 310, 312, and 314 Mott street, in the city of New York, by a petition praying for the condemnation of the buildings, filed by the department of health. In that petition it was alleged, substantially, that the buildings sought to be condemned were in such condition as to be dangerous to public health, and that they were not reasonably capable of being made fit for human habitation and occupancy, and that the evils caused by said buildings could not be remedied in any other way than by their destruction. To this petition an answer was filed, in which the appellant denied the existence of a nuisance upon said premises, or that the premises were not fit for human habitation, and practically put in issue the existence of all the facts which, by the statute in question, are necessary to authorize the condemnation of the buildings. Upon this issue a reference was ordered to hear and determine, and the referee found that the condition of affairs alleged in the petition existed, and that the plaintiffs were entitled to judgment for the appointment of commissioners. Judgment to that effect was accordingly entered, and thereupon three commissioners were appointed to appraise the value of the property, and a hearing was had before them in due form. As the result of that hearing, the compensation was fixed at the value of the materials of the building, and a final order confirming the report was entered, by virtue of which the amount awarded to the appellant was the sum found by the commissioners to be the value of the materials of the buildings, which was $110; and it was ordered that upon the payment of that sum to the appellant the health department should be entitled to enter upon the possession of the property condemned, and to hold it for public use, and to destroy the rear tenement house described in the petition. From that final order this appeal is taken, and in the notice of appeal it is stated that the defendant will bring up for review the judgment entered upon the report of the referee, and all proceedings antecedent thereto.

Before considering the reasons given by the appellant why this order should be reversed, it is advisable to examine the statute, to ascertain just what the object of the legislature was in passing it, and the means they have adopted to attain that object. The statute is in that part of the consolidation act which relates to the health department, and

contains the provisions with regard to tenement houses. As is well known, the condition of many buildings used for that purpose has been for years a menace to the public health, and grave questions have arisen as to the best manner in which the evils arising from their condition could be remedied, and the dangers to the public health averted. The condition of these houses arose, not alone from the habits of the inmates, but principally and largely from the construction, plans, and location of the buildings themselves. It was well understood that these evils were such as to seriously threaten the health of the community, and to render likely severe epidemics, with all the consequences which follow such a condition of affairs in a crowded community; and to meet that condition, and to avert these perils, careful inspection was required, and it might often be necessary to take summary measures to abate nuisances which, if permitted to exist, would endanger the health of the people of the city. To meet and provide for this condition of affairs was the object of the statute. It provides, in the first place, that whenever it shall be certified to the board of health that any building is infected with contagious diseases, or by reason of want of repair has become dangerous to life, or is unfit for human habitation because of defects in drainage, plumbing, ventilation, or the construction of the same, or because of the existence of a nuisance on the premises, and which is likely to cause sickness among its occupants, the board of health might, in a manner prescribed in the statute, require all persons to vacate the building. The statute provided for notice of the order to be given to the occupants of the building and to its owner or his agent, and it contained a further provision that whenever the defects mentioned in the order shall be remedied, or the danger shall cease to exist, the board of health might revoke the order. The statute further provided that "whenever, in the opinion of the board of health, any building or any part thereof, an order to vacate which had already been made by the board, is, by reason of age, defects in draining, plumbing, infection with contagious diseases or ventilation, or because of the existence of a nuisance on the premises which is likely to cause sickness, or because it stops ventilation in other buildings or otherwise makes or conduces to make other buildings adjacent to the same unfit for human habitation or dangerous or injurious to health, or because it prevents proper measures from being carried into effect for remedying any nuisance injurious to health or other sanitary evils in respect of such other buildings, so unfit for human habitation that the evils in or caused by said building cannot be remedied by repairs or in any other way than by destruction of said building or a portion of the same," the board was authorized to condemn the building, and order it to be removed. It provided, however, that, upon such condemnation being made, the owner might demand a survey of the building in the manner provided for in case of unsafe buildings. The proceedings for condemnation were to be taken by the board of health, and were to be proceeded with in the manner prescribed by the general law. The statute provided that upon the institution of the proceedings the owner, or any person interested in the building, might dispute the necessity of the destruction of the building, or any part thereof; and in that case the court was not authorized to appoint commission-

ers, unless proof was made of the necessity of such destruction. The foregoing is all that need be recited of the statute at present. It is quite clear that the object of this statute was to provide a summary way in which any nuisance in a building, as the result of which the building was dangerous to the health of its occupants or any other persons, might be summarily abated, and to provide further a way in which the existence of the nuisance should be adjudged, and the necessity of the destruction of the property upon which the nuisance existed might be decreed. When that had been done, the object of the statute was, further, to provide for the fixing of the compensation to which the owner of the building would be entitled, if its destruction was found to be necessary. The appellant here insists that the judgment appointing the commissioners to appraise the damages is erroneous, because there was no sufficient evidence that his buildings were unfit for human habitation, or that they were not capable of being made fit. No evidence upon this subject was offered by the defendant, and the case stands solely upon the proof made by the plaintiff of the situation and condition of these buildings, and such proof is entirely undisputed. The evidence showed that the building or buildings in question were situated in the rear of four other buildings owned by the appellant, which fronted upon Mott street, and were also occupied as tenement houses. These rear houses were 91 feet long from north to south, and a little over 20 feet wide. The length of the buildings was parallel with Mott street, and they extended across the premises of the defendant, occupying in their north and south course the whole width of those premises. They were five stories high. From the front of these buildings to the rear of the buildings occupying the front of the lot was a court extending the whole width of the lot, and being 5 feet in width on the northern extremity, and 7 feet at its widest part. This court was entirely surrounded by buildings, the lowest of which were three stories high. The front buildings, facing on Mott street, the rear of which formed the front wall of this court, were four stories high. On each end of this narrow court were buildings over 40 feet high, and the rear of the court was formed by the wall of the buildings in question, which were five stories high. At the southeast corner of this court there was a space of 11 inches between the rear wall of the building on the next lot and the south wall of the building in question, but, except for that space of 11 inches, there was no way in which fresh air could reach that court except from the top. The north and south walls of these buildings were dead walls, without any windows or ventilation whatever, except a small window on the north side of each story. The east wall stood next to a dead wall, and about 8 inches from it, so that the space between the east wall of the tenements in question and a blank wall of the buildings several stories in height, just east of it, was 91 feet long and 8 inches wide. As might be expected, this space was full of all sorts of filth, and its condition was such as to be unmentionable. The apartments in these buildings consisted of three rooms,—a front room, lighted and ventilated by two windows, each 5 feet by 3, opening into the front court yard; and two bedrooms in the rear, each 8 feet high and 6 feet 10 inches square, and lighted by a single window 2 feet square, opening onto the

court 8 inches wide, and having no other ventilation except that the bedrooms on the northeast corner on each floor had a window opening on the north into a yard. But, except for that, the bedrooms had no ventilation whatever, save such as they might get from the living room, or from the windows opening onto this ill-smelling and narrow court, 8 inches wide. The cellars of these buildings were occupied by school sinks for the use of all the tenants of both front and rear buildings. These cellars opened into the court yard, and had no other means of ventilation. They were damp, the floor being constantly wetted by the water from the hydrants in front of the buildings and by the sinks. The smell from the cellars going through the whole house was almost unendurable. The stairways in the buildings are narrow and steep, and always were dark and foul; and smoke and coal gas from the defective chimney flues have discolored the walls and ceilings so that it is impossible to make them white. The roofs leak, causing the rooms to be wet. The plaster on the walls and ceilings is cracked in many places, and portions of it have fallen. The places around the sinks in the hall are constantly damp from the waste splash. The houses swarm with vermin throughout. Every room is damp, and filled with air which is foul, and unfit to breathe. There is no possible way in which the sun could shine into these buildings. The only sunlight which could approach them is that which at certain hours of the day filters down into this court 7 feet wide, along their front; but the rays of the sun which fall into that court yard for a short time during the day cannot enter any of the rooms of the house, and are insufficient to properly light the lower floors, which are so dark that for a large portion of the time artificial light has to be used in them, as might be expected. What little sunlight filters into this court is obstructed by the fire escapes along the front of the buildings, which are used for the deposit of various articles by the tenants. This has been the condition of these buildings for a long time. The population in May, 1896, was 115 men, women, and children in the rear houses, and 150 in the front houses. Whereas the death certificates show that during the past six years the annual death rate in New York was 24 to 1,000, in these houses the death rate was 45.87 to 1,000. The death rate in these buildings was considerably higher than the death rate in the ward, and the infant death rate was abnormally high, so that in one year more than one-third of the children under five years of age in these buildings died. These deaths were largely caused by the diseases which are nourished by dampness and exposure to foul air. All these facts not only appeared by the testimony, but were entirely undisputed or unexplained; and, although it was made to appear that such had been the condition of affairs in these buildings for several years, there was no pretense that any effort had ever been made to remedy such of them as were remediable, or that the buildings themselves were capable of being repaired, or put into such condition as to be fit for human habitation.

From this testimony the learned referee was justified in his findings that these rear tenement houses were unfit for habitation. But the testimony was far from establishing that they were not capable of being made fit for habitation, or that the nuisance upon them could

not be abated in any other way than by their destruction. It was quite clear from the testimony that the unsanitary condition of the buildings was caused, to a very considerable extent, if not entirely, by the filthy habits of the persons who inhabited them, and grew out of the fact that they were used for human habitation. It did not appear that, after the buildings had been vacated, they might not easily have been put into a sanitary condition by proper repairs, and the removal of those offensive appurtenances which were more particularly complained of as the cause of its unhealthy condition. Even if it be said, however, from this testimony, that the referee would have been justified in finding that the buildings could not have been made fit for human habitation, still the necessity for their destruction was not made to appear. A thing is a nuisance when, because of its inherent qualities, or the use to which it is put, it works an injury to people who live in its neighborhood. The right to abate it arises from the necessity of the case, exists only because of that necessity, and is to be exercised only so far as the necessity requires. A thing which is a nuisance because of the use to which it is put cannot be destroyed by way of abating the nuisance, unless such destruction is necessary. If the nuisance can be abated by discontinuing the use, it must be abated in that way. Wood, Nuis. § 33; Ely v. Supervisors, 36 N. Y. 297. The case of Meeker v. Van Rensselaer, 15 Wend. 397, which has sometimes been relied upon as establishing the proposition that a building which was in a filthy condition, and calculated to breed disease, and was thereby a public nuisance, might be torn down by way of abating the nuisance, was decided upon the facts of that case. It was there made to appear, and was not disputed, that the only way of abating the nuisance was by the destruction of the buildings; and for that reason alone it was held by the supreme court that the destruction was justifiable. But in this case no such fact has been made to appear. Although the buildings may not have been capable of being made fit for habitation, still, if they were so put in repair that the evil smells should be removed, and the sources of contagion taken away,—as it is plain from the evidence might be done,—the buildings would cease to be a nuisance; and the fact that they might not thereby be made fit for human habitation would not authorize their destruction. If they ceased to be in such a condition as to breed pestilence and spread disease, and were rendered innoxious, the owner of them had a right to have them remain upon the premises, even though he might not be permitted to use them as a tenement house. There are many other uses to which he might lawfully put them; and the undoubted power of the public to refuse him permission to rent them to be used for human habitation did not necessarily involve the right to destroy them if they were not fit for that purpose.

One of the allegations in the petition was that the buildings prevented proper measures from being carried into effect for remedying nuisances dangerous to health and other sanitary evils in respect of other buildings to which they were adjacent. As has been said, it was made to appear that these buildings were erected within a very short distance of other buildings, which were also used as tenement

houses; and it is quite likely that the proximity of the two buildings deprived each of them of the ventilation necessary to make them fit for the uses to which the owners intended to put them. But, if these particular buildings were themselves in a proper condition, or were put in a proper condition, the fact that, located as they were, they stopped ventilation of other buildings, so that those other buildings were not fit to be used as tenement houses, was no warrant for the destruction of these buildings. It might furnish a good reason why the other buildings—not being supplied with sufficient air, so that they could be occupied by a great number of people—might be vacated, but was not a reason for the destruction of these buildings so that the other buildings might become more fitted for use as tenement houses, and thereby more valuable. In this country the right of one owner of property to have light and air for his buildings at the expense of land of another owner is not recognized, except it comes to exist by express contract. Myers v. Gemmel, 10 Barb. 537. All that the owner of any building can be called upon to do with regard to that building, if he desires to use it as a tenement house, is to keep it in such a condition as the statute requires. If he does that, he has complied with the law, and his building is not a nuisance. He cannot be compelled to submit to the destruction of his building, if it is on his own land, because some other building adjacent to it is thereby deprived of proper ventilation.

The case, then, so far as the plaintiff is concerned, must stand upon the condition of these buildings themselves, and upon the fact that they were not capable of being put in such a condition that they would not be of themselves dangerous to public health. Unless that was made to appear, the right to destroy them did not exist. In such cases the right to condemn grows out of the right to destroy the building because it is a public nuisance. and can be abated in no other way; and, unless that is made to appear, there can be no final order for condemnation. For the reason, therefore, that there was a complete failure of evidence to show that it was not practicable so to repair these buildings as that they might be put in a wholesome condition, and not remain a public nuisance, without their destruction, the judgment which is brought up on this appeal was erroneous, and must be reversed, and the final order must fall with the judgment.

PATTERSON, WILLIAMS, and O'BRIEN, JJ., concur. PARKER, J., not voting.